1  KAREN P. HEWITT
   United States Attorney
2  CHRISTOPHER P. TENORIO
   Assistant U.S. Attorney
3  California State Bar No. 166022
   880 Front Street, Suite 6293
4  San Diego, California  92101-8893
   Telephone: (619) 557-7843
5  Christopher.Tenorio@usdoj.gov

6  Attorneys for Plaintiff
   United States of America

7

8              UNITED STATES DISTRICT COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10 UNITED STATES OF AMERICA,        )  **GOVERNMENT'S RESPONSE IN OPPOSITION**
                                    )  **TO DEFENDANT'S MOTION FOR:**
11              Plaintiff,          )  **1)    DISCOVERY; AND**
                                    )  **2)    LEAVE TO FILE FURTHER MOTIONS**
12      v.                          )
                                    )  CASE NO.  08CR0274(3)-LAB
13 JESSICA KING (3),                )  JUDGE:    HON. LARRY A. BURNS
                                    )  COURT:    COURTROOM 9
14              Defendant.          )  DATE:     August 25, 2008
                                    )  TIME:     2:00 p.m.
15                                  )
                                    )  TOGETHER WITH STATEMENT OF FACTS,
16                                  )  MEMORANDUM OF POINTS AND
                                    )  AUTHORITIES
17 _____ )

18      COMES NOW the plaintiff, UNITED STATES OF AMERICA, by and through

19 its counsel, Karen P. Hewitt, United States Attorney, and Christopher

20 P. Tenorio, Assistant United States Attorney, and hereby files its

21 response in opposition to Defendant's above-listed motions.  Said

22 response is based upon the files and records of the case, together

23 with the attached Statement of Facts and Memorandum of Points and

24 Authorities.

25 //

26 //

27 //

28 //

# I.

## STATEMENT OF FACTS

**A.    Jordan Arnold**

    **1.    A.A.** (Date of Birth: October 9, 1991)

A.A. was born in October, 1991. In August, 2007, A.A. met Defendant Jordan Arnold at a party. A.A. truthfully told Arnold that she was 15 years old on the first evening they met. After approximately one week, Arnold began recruiting A.A. to work for him as a prostitute. A.A. relented after two days.

That same day, Arnold drove A.A. to El Cajon Boulevard and introduced her to Defendant Jessica King, who worked for Arnold as a prostitute. Arnold instructed King to teach A.A. how to solicit johns and otherwise operate as a prostitute. King instructed A.A., but left working for Arnold in approximately September, 2007.

After working once on El Cajon Boulevard, Arnold explained that he would post A.A.'s picture on Craigslist.com to solicit johns. Arnold brought A.A. to a hotel to take pictures for the internet posting. King used Arnold's mobile telephone to take pictures of A.A. in lingerie and provocative poses. A.A.'s photograph and ad were posted on the internet. A.A. received telephone calls for "dates" shortly after the ads were posted.

At Arnold's instruction, A.A. made arrangements by telephone to meet johns at various motels in the Mission Valley or Sports Arena area. Arnold and/or King usually drove A.A. to the hotels, A.A. performed a sexual act in exchange for money, A.A. called Arnold to pick her up, and A.A. gave all of the proceeds to Arnold.

//

//

**2. L.A.** (Date of Birth: September 1, 1993)

L.A., the sister of A.A., was born in September, 1993. L.A. met Arnold at the same party in August, 2007. L.A. learned that A.A. agreed to work as a prostitute for Arnold. L.A. agreed to work as a prostitute for Defendant Christopher Black, an associate of Arnold. Pictures of L.A. were also posted on Craigslist. Arnold occasionally drove L.A. to "dates" also. L.A.'s pictures were also found on Arnold's phone. L.A. reported that she stopped working after Arnold's arrest on October 11, 2007.

**3. H.C.** (Date of Birth: June 30, 1991)

On October 11, 2007, SDPD Vice officers responded to a Craigslist ad and made an undercover "date" with H.C. at the La Jolla Marriott. Surveillance confirmed that Arnold drove H.C. to the date. H.C. was detained for soliciting prostitution, and initially refused to cooperate against Arnold. Arnold was arrested and questioned by SDPD and FBI. A.A. was with Arnold at the time of his arrest and was also detained.

H.C. reported that she and K.W. (another juvenile from her group home) met Arnold and others on September 15, 2007, and accompanied them to several hotels in Mission Valley for three to four days. H.C. reported, and K.W. confirms, that H.C. told Arnold on the first day in the hotel that she was 16 years-old.

H.C. met A.A. during the first few days and learned she worked for Arnold in prostitution. Arnold told H.C. and K.W. they would have to choose a pimp. Arnold took pictures of H.C. at a hotel when she was in lingerie and provocative poses.

After a couple of days, Arnold brought H.C. and K.W. to live with A.A. and L.A., and their family. At Arnold's direction, A.A. taught

1    H.C. and K.W. how to put ads on Craiglist and respond to prostitution
2    clients.

3        Arnold drove H.C. to prostitution dates.  Arnold occasionally
4    rented hotel rooms that were used for the dates.  H.C. received calls
5    from dates on a cell phone Arnold had provided.  H.C. called Arnold
6    to pick her up from dates using the same phone.  H.C. gave all of the
7    prostitution proceeds to Arnold, keeping none.  H.C. was dependent on
8    Arnold for food, which he did not always timely provide.

9        On one occasion, Arnold pushed H.C. against a shower wall with
10   his arm on her throat.  Arnold also told H.C. he is a gang member and
11   that he has killed people previously.  Arnold told H.C. and others to
12   never speak with police.  H.C. was scared and worried that if Arnold
13   was not arrested she "would have to deal with it."    A.A.  has
14   corroborated the following.  Arnold instructed her to teach H.C. and
15   K.W. how to work in prostitution.  Arnold took pictures of H.C. at the
16   hotel with his mobile telephone's camera.  H.C. worked as a prostitute
17   for Arnold and charged $125 for one-half hour of sex.  H.C. gave all
18   of her prostitution proceeds to Arnold and often had to beg him for
19   money to buy food.  Arnold brought H.C., A.A., and L.A. to work in
20   prostitution on El Cajon Boulevard twice.  Arnold gave A.A.'s old
21   telephone to H.C. in order to allow them to stay in touch if something
22   went wrong during a "date."  Arnold has told H.C. that he and others
23   he knows have killed people before and that he is a gang member.  A.A.
24   was present when Arnold pushed H.C. into the shower wall and choked
25   her.  Arnold was also angered after learning H.C. had sex with an
26   associate.  K.W. also confirmed seeing Arnold beat H.C. on this
27   occasion.
28   //

1          **4.  K.W.** (Date of Birth: April 29, 1991)

2     K.W. confirmed to investigating officers that she and H.C. met

3 Arnold and others on September 15, 2007.  She told Arnold that she was

4 16 years-old when they first met.  Arnold brought K.W. and H.C. to

5 stay at local hotels where they were pressured to choose a pimp.

6     After a couple of days in hotels, Arnold brought K.W. and H.C.

7 to live at the home of A.A. and L.A..  Arnold instructed A.A. to teach

8 K.W. and H.C. how to work as a prostitute, including making "dates"

9 over the phone and how much to charge.  Arnold told K.W. that if she

10 reported anyone to the police, talked back, or didn't do as

11 instructed, he would personally break her jaw.

12          **5.  Arnold's Statement**

13     On October 12, 2007, San Diego Police Department ("SDPD") Vice

14 Detectives and FBI agents arrested Arnold after he was found driving

15 H.C., a suspected juvenile, to complete an act of prostitution.

16 Arnold was accompanied by A.A.  Police officers transported Arnold to

17 the police station.  There, they advised Arnold of his <u>Miranda</u> rights.

18 Arnold responded, "I'm gonna listen to my mom and I'm gonna get an

19 attorney."  Agents stopped questioning.  Arnold, however, asked what

20 type of questions the agents would have asked him.  When officers told

21 Arnold that they would not ask him questions if he was asking for a

22 lawyer, Arnold insisted on talking.

23     Arnold claimed he only wanted to be a good friend and help people

24 do whatever they wanted to do.  Officers asked Arnold if he knew that

25 H.C. was engaging prostitution at the hotels.  Arnold responded that

26 he could not be sure because he was not personally present in the

27 hotel room.  When asked how old A.A. was, Arnold stated she was 16

28 years old.

1   Arnold added, "I am assisting friends do what they want to do."
2   Because the encounters were consensual, Arnold claimed, "even
3   prostitution is okay."  He admitted that A.A. told him that he was
4   driving her to places in order for her to have sex with men in
5   exchange for money.  He also admitted he helped her out financially
6   by holding on to some of their money.

7   Arnold called his mother, Sylvia Arnold, several times from the
8   San Diego County Jail after his arrest.  Recordings of the calls were
9   obtained.  On October 12, 2007, Arnold instructed his mother to talk
10  to "them" because they are the "key to this whole thing."
11  Subsequently, Arnold told his mother to talk to "them" so there won't
12  be so many charges if they say the right stuff.  Arnold told his
13  mother to tell them the only thing he did was drive them.  Arnold
14  further instructed his mother to bring "the girls" to his arraignment.
15  Sylvia Arnold subsequently went to the home of A.A. and L.A. and spoke
16  to their mother.  A.A. and L.A. then accompanied Sylvia Arnold to
17  Arnold's arraignment.

18  On October 16, 2007, Arnold again told his mother that "all they
19  have to do is say they did everything by themselves."  He also
20  mentioned that they have to say that they didn't even give him money
21  for gas.

22  Two cell phones were on Arnold's person at the time of his arrest
23  on October 11, 2007.  One cell phone contained the photographs of L.A.
24  which A.A. which had appeared on Craigslist.

25  //
26  //
27  //
28  //

1    **B.    Christopher Black**

2        **1.    A.A.**

3    Defendant Christopher Black worked as a pimp with Arnold.    On

4    occasion, Black drove A.A. to dates at hotels when Arnold was

5    unavailable.  A.A. and Arnold were working at hotels often with Black

6    and L.A. (see below).    Black was present on occasions when A.A.

7    received calls for prostitution.

8        **2.    L.A.**

9        L.A. met Black at the same party where A.A. met Arnold in August,

10    2007.  Initially, L.A. told Black that she was 16 years-old, although

11    she was 13 years-old at the time.    L.A. began a sexual relationship

12    with Black that first evening and had sex with him on at least two

13    additional occasions.

14        L.A. agreed to work for Black as a prostitute after she learned

15    that A.A. agreed to work as a prostitute for Arnold.    Black took

16    photographs of L.A. and posted an internet ad from a computer.  Black

17    instructed L.A. that her picture and phone number would be on the

18    internet and she would receive calls soliciting sex.    L.A. informed

19    Black of her true age (14 years-old as of September 1, 2007)

20    approximately two weeks prior to her first posting on Craigslist.

21        Black instructed L.A. how much money to charge for prostitution.

22    She received an average of $150 for each "date." L.A.'s first date was

23    to the home of an unknown man.  Black drove L.A. to her dates.  L.A.

24    often called Black when the date arrived and called him to pick her

25    up after performing sex in exchange for money.  L.A. gave all of her

26    prostitution proceeds to Black. In total, L.A. had approximately 20

27    to 25 dates.

28    //

C.    **Jessica King**

1.    **A.A. and L.A.**

When A.A. finally agreed to perform acts of prostitution for Arnold, Arnold drove her to El Cajon Boulevard and introduced her to Defendant Jessica King, who worked for Arnold as a prostitute. Arnold instructed King to teach A.A. and L.A. how to solicit johns and otherwise operate as a prostitute. King instructed A.A. and L.A. as instructed, but left working for Arnold in approximately September, 2007.

King used Arnold's mobile telephone to take pictures of A.A. in lingerie and provocative poses. L.A. was present when King posted an ad on the internet and make prostitution arrangements over the telephone. King posted A.A.'s picture on Craigslist for Arnold. King occasionally drove A.A. to the hotels where A.A. performed acts of prostitution.

2.    **King's Statement**

King was arrested by SDPD on November 8, 2007 for pimping and pandering. She provided the following. King previously worked in prostitution in Las Vegas but returned home to San Diego where Arnold became her pimp. King had known Arnold in high school. King gave the majority of her prostitution proceeds to Arnold.

King admitted that Arnold told her to teach A.A. and L.A. how to work in prostitution. King, however, left Arnold three weeks later because she was very uncomfortable due to the girls' ages. King claims she told Arnold that A.A. and L.A. were too young but Arnold "would not listen." King believes Arnold has changed because he has become angry and mean.

//

## II.

### **THE GOVERNMENT WILL COMPLY WITH DISCOVERY OBLIGATIONS**

Defendant moves to compel discovery.  Except as described below, the Court should deny Defendant's discovery requests.

### **1.   Rule 16(a)(1)(A): Defendant's Statements**

The Government has already disclosed all known written statements of Defendant, reports of recorded statements, and the substance of oral statements made by Defendant in response to questions by government agents in this case.  The government will attempt to obtain copies of Defendant's recorded statements.

### **2.   Arrest Reports, Notes and Dispatch Tapes**

The Government at this time objects to the full production of the officers' handwritten or rough notes of interviews with prospective witnesses, or the production of any dispatch tapes or notes taken while listening to any dispatch tapes.

The discovery of rough notes of an interviewing agent are only potentially discoverable under the Jencks Act or Rule 16, and may be preserved to permit the district court to potentially decide whether they become discoverable.  United States v. Harris, 543 F.2d 1247, 1252-53 (9th Cir. 1976); but see United States v. Griffin, 659 F.2d 932, 940 (9th Cir. 1982) (holding that the Harris court "actually failed to reach the issue of whether Rule 16 requires the preservation and subsequent production of an agent's rough notes of an interview with [a] defendant.").  Whether notes must be produced must be decided on a case-by-case basis after an examination of the relevant facts, but not where the substance of the notes have been preserved in a formal memorandum.  United States v. Pisello, 877 F.2d 762, 768 (9th Cir. 1976), cited in United States v. Williams, 291 F.3d 1180, 1191

(9th Cir. 2002).

Pre-trial production of rough notes of interviews with prospective witnesses is generally not required. See 8 U.S.C. § 3500. If rough notes do exist, they may become discoverable if they constitute "statements" within the meaning of the Jencks Act. Notes of investigators are "statements," only if they are (1) writings made by the witness are "signed or otherwise approved or adopted" by him, or (2) accounts which are "a substantially verbatim recital" of the witness's oral statements "recorded contemporaneously with the making of such oral statement." 18 U.S.C. § 3500(e); Griffin, 659 F.2d at 936.

If such notes constitute "statements," then they are discoverable after the testimony of the person from whom the statement was obtained, where that person "signed or otherwise approved" the statement (18 U.S.C. § 3500(e)(1)), or they are verbatim recitals of the interviewee's oral statements to the interviewing agent (18 U.S.C. § 3500(e)(2)). Id. at 937. The notes would not become discoverable after the testimony of the interviewing agent because the "statement" does not represent the agent's own words. Id. at 938. Notes of observations taken while on surveillance are also generally incomplete and not discoverable because they do not comprise a substantially verbatim narrative of the officer's assertions. United States v. Bobadilla-Lopez, 954 F.2d 519, 521-522 (9th Cir. 1992); United States v. Spencer, 618 F.2d 605, 606-07 (9th Cir. 1980).

If such rough notes exist in this case of interviews with potential witnesses, they would also remain undiscoverable under Rule 16 unless they have been adopted verbatim by the interviewed witness or are otherwise discoverable pursuant to Brady. See e.g., United

States v. Friedman, 593 F.2d 109, 119 (9th Cir. 1979).  A statement of a government witness is discoverable pursuant to Rule 16 only to the extent that its production is compelled by the Jencks Act.  Id. at 120; United States v. Walk, 533 F.2d 417, 419 (9th Cir. 1975).

Further, although Rule 16(a)(1) allows for the discovery of a written or recorded statement made by the defendant, notes of an investigator which incorporate the statements of a witness, which in turn contain oral "statements" allegedly attributable to the defendant, are not discoverable except as permitted by the Jencks Act. Walk, 533 F.2d at 418.  Further, Rule 16(a)(1)(A) does not require the discovery of a defendant's oral statements unless they are made in response to interrogation by a person the defendant knows to be a federal agent.  United States v. Hoffman, 794 F.2d 1429, 1432 (9th Cir. 1986).  Notes of voluntary oral statements by the defendant, therefore, are not discoverable.  Id.

### 3.    Rule 16, and Brady: For All Purposes, Including Sentencing

The Government is well aware of, and will fully perform, its duty under, Brady v. Maryland, 373 U.S. 83 (1963), and United States v. Agurs, 427 U.S. 97 (1976).  Accordingly, the Government will disclose exculpatory evidence within its possession that is material to the issue of guilt or punishment.  Defendant is not entitled to all evidence known or believed to exist which is, or may be, favorable to the accused, or which pertains to the credibility of the Government's case.  As the Ninth Circuit Court of Appeals stated in United States v. Gardner, 611 F.2d 770 (9th Cir. 1980):

//

//

> [T]he prosecution does not have a constitutional duty to disclose every bit of information that might affect the jury's decision; it need only disclose information favorable to the defense that meets the appropriate standard of materiality.

Id. at 774-75 (citations omitted).    See also United States v. Sukumolachan, 610 F.2d 685, 687 (9th Cir. 1980) (the Government is not required to create non-existent exculpatory material); United States v. Flores, 540 F.2d 432, 438 (9th Cir. 1976) (Brady does not create any pretrial discovery privileges not contained in the Federal Rules of Criminal Procedure).

The Government is unaware of any Brady material beyond that discussed above, and will produce such material if it becomes available. The Government is presently unaware of any criminal involvement by any prospective government witness, or that any prospective government witness is under investigation.

### 4.    Rule 16(a)(1)(A), (B) and (C) and Fed. R. Evid. 404(b): Prior Arrests, Convictions Or Bad Acts

The Government has provided Defendant with evidence of his prior criminal record and prior bad acts pursuant to Rules 16(a)(1)(A), (B) and (C).    The Government reserves the right to introduce such prior bad acts, and will address such evidence and its intentions in motions in limine to be filed separately according to the Court's scheduling orders.

### 5.    Rule 16(a)(1)(C): Documents and Tangible Evidence and Evidence Seized

In accordance with obligations under Rule 16(a)(1)(C) and 16(c), the Government will permit the Defendant to inspect and copy or photograph all books, papers, documents, photographs, tangible objects, buildings, or places, or portions thereof, which are within

or may come within the possession, custody, or control of the Government, and which are material to the preparation of the Defendant's defense or are intended for use by the Government as evidence-in-chief at trial or were obtained from or belong to the Defendant.

### 6.    Expert Witness Notice Will Be Provided

The Government will meet obligations pursuant to Fed. R. Crim. P. 16(a)(1)(E) to disclose information regarding expert witnesses. The Government will produce details regarding the nature of the expert's testimony, and the qualifications of the expert if and when a trial date is scheduled and any expert is obtained.

### 7.    Evidence of Bias, Motive to Lie, Impeachment or Criminal Investigations Regarding Government Witnesses

The Government has provided all relevant statements from which Defendant may argue a witness is biased or prejudiced against Defendant. The Government is unaware of any evidence that prospective witnesses have a motive to falsify or distort testimony. The Government is aware of, and will comply with, its obligations regarding impeachment evidence pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and <u>United States v. Agurs</u>, 427 U.S. 97 (1976).

### 8.    The Defendant Is Not Entitled to Witness Addresses

The Government objects to Defendant's request for witness addresses. The objection is especially strong here where the witnesses are primarily juveniles who have expressed fear and repercussion of the defendant. Defendant may schedule access to witnesses through the Government or the witnesses' guardians.

//

//

1        **9.    The Government Is Unaware of Favorable Defense**
2             **Witnesses**

3        The Government is unaware of any witness who made a favorable
4   statement concerning the Defendant, or of any statement that may be
5   favorable to Defendant's defense, which have not already been provided
6   in discovery.

7            **10.   The Government Will Comply With *Giglio***

8        The Government has not made any promises, express or implied, to
9   any government witnesses in exchange for their testimony in this case.
10  Therefore, the Government is currently unaware of any discoverable
11  impeachment information pursuant to Giglio v. United States, 405 U.S.
12  150 (1972).

13            **11.   Jencks Act**

14       Consistent with the Jencks Act, 18 U.S.C. § 3500, the Defendant
15  is not entitled to disclosure of witness statements prior to the
16  witness testifying on direct examination at trial.  The Government
17  must produce these statements only after the witness testifies on
18  direct examination. United States v. Taylor, 802 F.2d 1108, 1118 (9th
19  Cir. 1986); United States v. Mills, 641 F.2d 785, 790 (9th Cir.).
20  Indeed, even material believed to be exculpatory and, therefore,
21  subject to disclosure under the Brady doctrine, if contained in a
22  witness statement subject to the Jencks Act, need not be revealed
23  until such time as the witness statement is disclosed under the Act.
24  See United States v. Bernard, 623 F.2d 551, 556 (9th Cir. 1979).

25       The Government reserves the right to withhold the statements of
26  any particular witnesses until after they testify.  However,
27  notwithstanding any statements the Government deems necessary to
28  withhold, the Government will disclose witness statements prior to

trial in as timely a manner as practicable, provided defense counsel has complied with his obligations under Rules 12.1, 12.2, 16 and 26.2 of the Federal Rules of Criminal Procedure, and provided that defense counsel submitted all reciprocal discovery and "reverse Jencks" statements.

The Government will comply with its Rule 26.2 obligation to produce for the Defendant's examination statements of witnesses in the Government's possession after, or shortly before, such witnesses testify on direct examination.  The Government objects to the Defendant's request that such statements be produced at this time. Similarly, if Rule 12(i) becomes relevant pursuant to suppression proceedings, the Government will comply with obligations to produce statements in accordance with Rule 26.1.

The Government objects to Defendant's request for handwritten I-213 forms to the extent, if any exist, the identical information has been provided in the typewritten versions provided.

### 12.  **Residual Request**

The Government objects to Defendant's broad, unarticulated "residual" discovery request.  The Government will otherwise comply with its continuing discovery obligations.

### 13.  **Preserve Evidence**

The Government does not object to Defendant's motion to preserve evidence to the extent it covers evidence within the Government's possession and discoverable pursuant to Federal Rule of Criminal Procedure 16. The Government objects, however, to Defendant's blanket request to preserve unspecified evidence.

//

//

**III.**

**THE GOVERNMENT DOES NOT OPPOSE LEAVE TO FILE FURTHER MOTIONS**

Although the Government does not oppose in principle Defendant's request to file further motions, the Government would oppose the filing of any further substantive motions that would not be entertained by the court until the time set aside for motions in limine.    If the defendant foresees the need to file further substantive motions, the Government respectfully requests that the defendant request, and the Court set, a separate date for an additional motion hearing, and that any motions in limine and trial not be set until the conclusion of such hearing.

**IV.**

**CONCLUSION**

Based on the foregoing, except where noted otherwise, the Court should deny Defendant's motion for discovery.

DATED: July 23, 2008

Respectfully submitted,

KAREN P. HEWITT
United States Attorney

s/ Christopher P. Tenorio
CHRISTOPHER P. TENORIO
Assistant U.S. Attorney

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                        SOUTHERN DISTRICT OF CALIFORNIA

10   UNITED STATES OF AMERICA,        )        **CERTIFICATE OF SERVICE**
                                      )
11                   Plaintiff,       )   CASE NO.   08CR0274(3)-LAB
                                      )   JUDGE:     HON. LARRY A. BURNS
12      v.                            )   COURT:     COURTROOM 9
                                      )
13   JESSICA KING,                    )
                                      )
14                   Defendant.       )
     ─────────────────────────────── )
15

16   IT IS HEREBY CERTIFIED that:

17       I, CHRISTOPHER P. TENORIO, am a citizen of the United States and

18   am at least eighteen years of age.  My business address is 880 Front

19   Street, Room 6293, San Diego, California 92101-8893.

20       I am not a party to the above-entitled action.  I have caused

21   service of **GOVERNMENT'S RESPONSE AND OPPOSITION TO DEFENDANT'S MOTIONS**

22   on Defendant's attorney by electronically filing the foregoing with

23   the  Clerk  of  the  District  Court  using  its  ECF  System,  which

24   electronically notifies them.  I declare under penalty of perjury that

25   the foregoing is true and correct.

26       Executed on July 23, 2008    Respectfully submitted,

27                                    *s/Christopher P. Tenorio*
                                      ─────────────────────────
                                      CHRISTOPHER P. TENORIO
28                                    Assistant U.S. Attorney